UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 5:25-CR-113-REW-MAS |
| | ) | |
| v. | ) | |
| | ) | OPINION & ORDER |
| MARVON BOND, | ) | |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

Defendant Marvon Bond moves to suppress all evidence seized by Lexington Police Department ("LPD") officers during an interaction that occurred on August 10, 2025. *See* DE 19 (Motion to Suppress). Bond argues that the officers' search of his vehicle was warrantless and nonconsensual, that no exception to the warrant requirement justified their search under the circumstances, and that any evidence obtained from the unlawful search must be suppressed under the exclusionary rule.[1] *See id.* at 1. The United States responded in opposition, *see* DE 21 (Response), and Bond replied, *see* DE 22 (Reply). The Court conducted an evidentiary hearing on December 2, 2025. *See* DE 29 (Minute Entry). Following the presentation of evidence and arguments of counsel, the Court took the suppression motion under advisement. *See id.* at 1. For the reasons explained below, the Court **GRANTS** Bond's suppression motion, DE 19. The searching officers entered Bond's car without probable cause, and the Court suppresses all resulting search fruits as prohibited proof under the exclusionary rule and Fourth Amendment.

---

[1] And the gun supporting the indictment came from a search incident to arrest premised on the contents of the car.

I.     Background

The Court has reviewed the full record, to include the docket, all motion briefing, the evidentiary hearing, and the body camera footage from the night. Officers Brown, Rogers, and Dixon all testified and authenticated their digital recordings from the interaction.

At approximately 1:00 a.m. on August 10, 2025, LPD Officers Brown and Ramey were patrolling on foot a public "pay to park" surface parking lot in downtown Lexington, where they encountered Bond's unoccupied red passenger vehicle parked in that lot. The patrol was part of a summer enforcement focus in the "Short Mill" area of downtown, an area Brown cited as featuring higher crime on summer weekends at that time of night, such crime including drug use/possession, alcohol abuse, and shootings connected to bar activity. At the hearing, Officer Brown[2] testified that, typical of his practice of inspecting cars as he walked the beat, he looked into Bond's car; he detailed what he saw, aided by his flashlight, as he looked into the passenger compartment from outside the car.

Brown reported that he saw a black sling or shoulder bag on both front seat floorboards, each partly tucked under the respective seat. He associated the bags with illegal conduct, suggesting it is becoming more common for offenders to carry drugs and guns in such bags. He also viewed the location of the bags as suspicious, indicating an effort to hide the bags from being visible outside the car.

Brown also recalled seeing an open container of alcohol (a container with some of the content missing, thus indicative of having been opened) on the passenger floorboard. In Brown's view, the item was contraband under Kentucky's open container law, KRS 189.530(2), given the

---

[2] Brown, the Court notes, has been a patrol officer with LPD for 2+ years. He testified about his experience with the Short Mill area, and with some traffic stops, but he offered nothing regarding his training.

location of the car. He viewed anywhere, like the pay lot at issue, that could enter onto or exit from a public highway as falling within the prohibited definition.

Finally, Brown claimed to see part of (precisely, the rounded corner of) a baggie or packaging he associated with marijuana or THC products. Marijuana is a drug frequently encountered in the Short Mill area, per Brown, and he viewed the type of package he perceived (a small, rectangular bag with rounded corners, made of dense material with a metallic sheen, with a resealable zip top) as likely containing contraband. He had seen such bags on other traffic stops and during the summer enforcement surge downtown.

As LPD waited for the occupants to return to the car, officers ran a registration check on the vehicle, which identified Bond as the registered owner. Additional database checks revealed Bond's status as a convicted felon on cocaine charges. The information did not detail the type or recency of the crime(s) of conviction.

At the direction of Officer Brown, other officers monitored the parking lot for Bond's return to the vehicle. Eventually, Bond and another man returned, at which point the officers approached and detained both subjects. Both Officers Brown and Rogers proceeded to open the car's front doors, with Brown first opening the driver-side door, and Rogers (who had seen for himself the open container and thought it justified entry) promptly opening the passenger-side door. Upon opening the car doors to seize the alcohol bottle and suspected marijuana package, the officers perceived a strong odor of marijuana emanating from inside the vehicle. Based on this plain smell, the officers expanded the scope of the search, including searching the sling bags located on the floorboards of the front seats. Sure enough, the sling bags contained additional marijuana products, drug paraphernalia (a scale), and a prescription bottle containing suspected

3

alprazolam (commonly known as "Xanax") pills. Further, the passenger door did contain two small packages of marijuana product.

The officers then searched both subjects, finding a firearm on each. Eventually, a federal grand jury returned a single-count indictment charging Bond with a violation of 18 U.S.C. § 922(g)(1), being a convicted felon in possession of a firearm. *See* DE 3 (Indictment). Bond now moves to suppress the evidence seized during the officers' search of Bond's person, being derivative of a tainted search of his car.

The Court surely recognizes the importance of disarming felons, but the Fourth Amendment is the supreme law of the land, and its values here dictate suppression. Probable cause did not exist to support entering the vehicle to seize the alcohol or suspected marijuana packaging.

## II.   Legal Standard

The Fourth Amendment guarantees the right of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *See* U.S. CONST. amend. IV; *see also California v. Carney*, 105 S. Ct. 2066, 2068 (1985). Generally, a search is "reasonable" under the Fourth Amendment only if it is "conducted pursuant to a warrant issued by an independent judicial officer." *See Carney*, 105 S. Ct. at 2068. Searches conducted without a valid warrant "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 88 S. Ct. 507, 514 (1967); *United States v. Lewis*, 81 F.4th 640, 651 (6th Cir. 2023). The defendant bears the burden of showing a "violation of some constitutional or statutory right justifying suppression." *See United States v. Rodriguez-Suazo*, 346 F.3d 637, 643 (6th Cir. 2003); *United States v. Russell*, 26 F.4th 371, 375 (6th Cir. 2022). However, "the [G]overnment bears the burden of demonstrating

4

an exception to the warrant requirement." *See Mockeridge v. Harvey*, 149 F.4th 826, 835 (6th Cir. 2025) (quoting *Taylor v. City of Saginaw*, 922 F.3d 328, 334 (6th Cir. 2019)).

The automobile exception to the Fourth Amendment warrant requirement permits an officer to conduct a warrantless search of a vehicle if the officer has probable cause to believe that the vehicle contains contraband or evidence of a crime. *See United States v. Watson*, 142 F.4th 872, 881 (6th Cir. 2025). Once the officers have probable cause, they typically may search the entire vehicle and any containers located in it. *See United States v. Peake-Wright*, 126 F.4th 432, 438 (6th Cir. 2025). Probable cause consists of "a reasonable ground for belief, supported by less than prima facie proof but more than mere suspicion." *See Watson*, 142 F.4th at 877 (quoting *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008)). It requires "only a probability or substantial chance of criminal activity[.]" *See Peake-Wright*, 126 F.4th at 438 (quoting *United States v. Tagg*, 866 F.3d 579, 585 (6th Cir. 2018)). Whether probable cause existed at the time of the search is a commonsense question hinging on the totality of the circumstances. *See id.* at 439.

The plain view doctrine, a related or sub-exception to the warrant requirement, permits warrantless seizures. *See United States v. Lewis*, 81 F.4th 640, 654 (6th Cir. 2023). Under the plain view doctrine, an officer may make a warrantless seizure if four factors are satisfied: "(1) the item seized must be in plain view, (2) the item's incriminating character must be immediately apparent, (3) the officer must lawfully be in the place from where the item can be plainly seen, and (4) the officer must have a lawful right of access to the item." *See United States v. Loines*, 56 F.4th 1099, 1106 (6th Cir. 2023) (citing *Horton v. California*, 110 S. Ct. 2301 (1990)).

A few more salient points about the concepts: The probable cause standard "is not a high bar." *See District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018) (citing *Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014)). A fair probability or reason to believe that evidence of crime exists

5

in a location is below the preponderance standard. *See United States v. McCallister*, 39 F.4th 368, 374 (6th Cir. 2022). Further, a court (like law enforcement) is entitled to make reasonable inferences on the facts, and a court typically gives considerable weight to the opinions of well-trained and experienced law enforcement officers. *See United States v. Whiteside*, 141 F.4th 734, 742 (6th Cir. 2025).

The plain view requirement also invokes probable cause. The proof standard is no higher, but it must be immediately apparent to the officer, or the collective of officers, that there is probable cause to believe an item at issue, when perceived and seized, is evidence of crime. *See United States v. Mathis*, 738 F.3d 719, 732 (6th Cir. 2013). The item must, then, be intrinsically incriminating on plain view. *See United States v. McLevain*, 310 F.3d 434, 442 (6th Cir. 2002). Innocuous or quotidian items that merely *could* be used unlawfully are not thereby subject to plain-view seizure; rather, there must be "an immediately apparent association between the items and the purported criminal activity." *See Loines*, 56 F.4th at 1110; *see also United States v. Beal*, 810 F.2d 574, 578 (6th Cir. 1987) ("[T]his circuit has vigorously adhered to the requirement that probable cause must be both immediate and apparent.").

### III.  Analysis

In the Government's view, there were two valid, constitutional bases for entering the vehicle. Its theories: First, the open alcohol container on the passenger floorboard constituted a violation of KRS 189.530(2), justifying entry into the vehicle under the plain view doctrine and the automobile exception. *See* DE 21 at 5. Second, Officer Brown's plain view of the marijuana package justified entry into the vehicle under the plain view exception or, most broadly, in conjunction with the surrounding circumstances, the automobile exception. *See id.* at 7-8. Once the officers validly opened the car door, the emanating plain marijuana smell justified an expanded

6

search of the vehicle's interior. *See id.* Upon finding evidence of a crime supportive of arrest, Bond was subject to a search incident to arrest, which yielded the firearm underlying Bond's indictment. *See id.* at 10. Aside from this sequence, the Government argues that the search of Bond's person was a constitutionally permissible frisk for weapons under *Terry*. *See id.*

Bond asserts that the officers' entry into his vehicle violated the Fourth Amendment, arguing that neither the open alcohol bottle nor the putative marijuana package justified a warrantless search of the vehicle. *See* DE 19 at 1. More specifically, Bond argues that the officers did not have probable cause to believe that a violation of KRS 189.530(2) occurred based on the open bottle of alcohol because the vehicle was not located "on a public highway or on the right-of-way of a public highway." *See id.* at 3. Bond next argues that neither plain view nor the automobile exception permitted a warrantless entry into his car. *See id.* at 4. As for plain view, Bond argues that the incriminating nature of the spied bag was not immediately apparent. *See id.* As for the automobile exception, Bond argues that the officers did not have probable cause that evidence of a crime or contraband was in the car based solely on observation of the corner of the bag and the surrounding circumstances. *See id.*

Bond does not dispute the propriety of the search expansion once the vehicle's doors were open due to the plain smell of the marijuana. *See United States v. Foster*, 376 F.3d 577, 588 (6th Cir. 2004) (recognizing that the plain smell of marijuana coming from a vehicle provided officers with probable cause to search the vehicle without a warrant). The operative issue before the Court is therefore whether the officers validly entered Bond's vehicle, based on either the open alcohol container or the marijuana baggie. The legitimacy or not of entry defines and decides the case.

7

### a. Open Alcohol Container

Bond's first ground for suppression is that the open container of alcohol on his vehicle's passenger floorboard was not a violation of KRS 189.530(2); as such, the automobile exception did not justify a warrantless entry, and the bottle was not contraband in plain view. KRS 189.530(2) states that a person "is guilty of possession of an open alcoholic beverage[3] container in a motor vehicle, when he or she has in his or her possession an open alcoholic beverage container in the passenger area of a motor vehicle located on a public highway or on the right-of-way of a public highway." The parties dispute the applicable definition of "public highway or right-of-way of a public highway." Under either asserted definition, however, Bond's vehicle was not on a public highway or right-of-way of a public highway.

Bond argues that the subsection of the open container law defining "public highway" or "right-of-way of a public highway" controls. *See* DE 22 at 2. That section defines the terms as "the entire width between and immediately adjacent to the boundary lines of every way publicly maintained when any part thereof is open to the use of the public for purposes of vehicular travel." KRS 189.530(6). Officer Brown testified that Bond's vehicle was parked in a parking lot off Church Street and Skillman Alley in downtown Lexington that was open to the public as a pay-to-park lot, where a customer pays by scanning a QR code. This parking lot would not be considered a public highway under KRS 189.530(6) because it is not a "way publicly maintained" and is instead privately owned. The Government did not argue and offered no proof to suggest that the lot at issue is publicly maintained or is immediately adjacent to the boundary lines of such a way. Therefore, applying the definition cited by Bond, there is no violation of KRS 189.530(2). Bond's

---

[3] Subsection (4) defines an open container as one that is "open or has a broken seal; or [t]he contents of which are partially removed." All hearing proof supports that the bottle was an open container of alcohol.

8

definition has the benefit of tracking the statutory text, which clearly provides the definition applicable "[f]or the purposes of this section." *See* KRS 189.530(6).

Oddly, the Government casts the definition in subsection (6) as a "companion" or "expansion" to a base definition in Chapter 189, citing KRS 189.010(3) as the governing definition. *See* DE 21 at 6. That section defines "highway"[4] as

> [A]ny public road, street, avenue, alley or boulevard, bridge, viaduct, or trestle and the approaches to them and includes private residential roads and parking lots covered by an agreement under KRS 61.362, off-street parking facilities offered for public use, whether publicly or privately owned, except for-hire parking facilities listed in KRS 189.700[.]

KRS 189.010(3). This general definition plainly is broader than the "way publicly maintained" reference within the open container statute. In the evidentiary hearing, the Government also brought to the Court's attention KRS 189.396, which provides that "[a]ll law enforcement officials shall enforce the traffic regulations contained in KRS Chapter 189 on off-street parking facilities offered for public use, except for-hire parking facilities listed in KRS 189.700." What is plain from this collection of statutes is this—a private, for-hire parking facility is not a "highway," and thus even more clearly not a "public highway," and KRS 189.396 by its terms does not apply to such a locale.[5]

KRS 189.700 does little to clarify directly the for-hire parking facility term, providing only that such lots are "automobile parking lots or automobile storage garages, wherein automobiles are parked or stored for hire." The Government, which has the burden and did little lifting on it here, adds no further authority, contending that the statute addresses vehicles for hire (leased vehicles) and the parking of same; but the statute does not say automobiles for hire but instead

---

[4] KRS 189.530(2) prohibits conduct on a "public highway," a definition the Court views as distinguishable from, certainly narrower grammatically than, the unmodified "highway."
[5] The Government did not suggest or prove application of KRS 61.362.

9

"automobiles . . . parked or stored for hire." The Court rejects the Government's strained grammar and interprets "for hire" to mean the parking location is offered in exchange for payment.[6]

Indeed, most of KRS 189.700-.720 addresses liability limitations in the realm of paid parking. The "for hire" denomination seems to borrow from language tracing back to duty distinctions that varied based on the type of bailment involved under Kentucky law. Thus, there were gratuitous bailments, bailments for mutual benefit, and bailments "for hire."[7] When the bailor paid money to the bailee, the third category applied. Here, the statutes largely sort the relationship between a for-hire parking facility and the involved customer, some of which involve or create bailment obligations and some of which expressly do not.[8] Those fine points are not the subject matter of this case. However, the legislature chose to except from the concept of "highway" and from the general regulatory extension of KRS 189.396 areas within the "for-hire parking" category.[9] That category includes paid, *i.e.*, "for hire," parking in a private lot. Bond parked in a private lot that required payment to park; he was in for-hire parking and thus not in an area covered by the open-container prohibition, under either party's theory.

---

[6] *See RCG Props., LLC v. City of Atlanta Bd. of Zoning Adjustment*, 579 S.E.2d 782, 784 (Ga. Ct. App. 2003) ("That code section defines a 'park-for-hire facility' as: 'Any facility for the parking of motorized vehicles, for which service the operator thereof charges a fee.'").

[7] *See Mezo v. Warren Cnty. Pub. Libr.*, No. 2009-CA-000631-MR, 2010 WL 323302, at *2 (Ky. Ct. App. Jan. 29, 2010) (noting gratuitous bailment exists where there is no compensation); *Monarch Warehouse Co. v. Major Breckinridge Corp.*, 518 S.W.2d 779, 781 (Ky. 1975) (noting duties where bailment is "for hire or mutual benefit"); *Hargis v. Spencer*, 71 S.W.2d 666, 671 (Ky. 1934) (discussing duty differences "where the relation of bailor and bailee exists for hire").

[8] *See also Cent. Parking Sys. v. Miller*, 586 S.W.2d 262, 263 (Ky. 1979) (generally rejecting application of bailment concepts to unattended, automated parking lots involving payment).

[9] Indeed, the lot here would not qualify as a bailment because Bond kept control of his key, and he parked his own car. But a lot can be for hire and not a bailment, as the statutes make clear. *See* KRS 189.710 (assigning liability as "bailee for hire" in certain but not all situations); *see also* KRS 189.705 (contrasting circumstance where lot operated for hire but without attendant or based on meters or "honor system which requires no attendant"). Section 189.715 plainly notes that a lot or garage that parks or stores automobiles for hire may also, but does not necessarily, "act as bailee[] for said automobile[.]" The point is that the statutory area uses language from the law of bailment, the "for hire" differentiation to show paid parking, but that language does not mean to limit the garages or lots covered to bailment situations.

The LPD, both via Officers Brown and Rogers, viewed Bond, the vehicle's owner, as being in violation of KRS 189.530(2) upon his custody of the car within that paid lot. However, because the car was not "located on a public highway or on the right-of-way of a public highway," and because KRS 189.396 excepts "for-hire parking facilities," the open container was not, at the time, contraband.[10]

Accordingly, the open alcohol container in Bond's vehicle's passenger floorboard did not violate KRS 189.530(2). Thus, because the open alcohol container in Bond's vehicle was not contraband or evidence of a crime, LPD, which misconstrued its authority, had no right to open the car to seize the bottle.[11]

### b. Marijuana Package

The Government, through its response and the testimony elicited at the evidentiary hearing, argues that the officers' entry into Bond's vehicle was otherwise constitutional as falling within an exception to the warrant requirement based on Officer Brown's observation of the suspected marijuana package, in the full case context. In essence, the Government contends that the totality of the circumstances supports a finding that there was probable cause to treat the packet viewed as contraband, justifying entry.

---

[10] Certainly, if Bond had driven out of that lot, he would have been in violation. If Bond (or his passenger) had stood in the lot and consumed the alcohol, he'd have a problem under KRS 222.202. If Bond drove to the lot with the open container, he would have violated KRS 189.530(2) in getting to the lot. The Government did not premise the search power on any of these counterfactual theories or hypotheticals; rather, it contended that the KRS 189.530(2) violation occurred in the lot, and that argument is not tenable.
[11] Office Rogers popped the door on his side only because of the alcohol he saw. That entry was not justified. However, Brown had already opened his side of the car, and the testing of the Brown entry determines the overall propriety of the search. Collective law enforcement knowledge applies to the plain view rubric. *See United States v. Perkins*, 994 F.2d 1184, 1187 (6th Cir. 1993) (upholding a search because "[c]ollectively, the officers in this case had ample probable cause to stop and search the vehicle being driven by [the defendant]")

11

### i. Plain View

The Court articulated the four plain view factors above. Bond challenges only two: that the marijuana bag was in plain view, and that the incriminating nature of the bag was immediately apparent.[12] Officer Brown testified that, despite the tinted windows and physical layout of the car, he was able to view the corner of the package, within the door pocket or panel, through the windshield and the passenger door window. The Sixth Circuit recognizes that an officer's testimony can be sufficient to establish that the incriminating item was visible from outside the car. *See Loines*, 56 F.4th at 1107. The Court therefore finds this element satisfied.

Courts look to four instructive factors, where apt, to determine whether an object's incriminating nature is immediately apparent: "(1) a nexus between the seized object and the items particularized in the search warrant; (2) whether the 'intrinsic nature' or appearance of the seized object gives probable cause to believe that it is associated with criminal activity; (3) whether the executing officers can at the time of discovery of the object on the facts then available to them determine probable cause of the object's incriminating nature; . . . [and (4) whether the officer can] recognize the incriminating nature of an object as a result of his immediate or instantaneous sensory perception. *See id.* at 1108 (quoting *United States v. Garcia*, 496 F.3d 495, 510-11 (6th Cir. 2007)). In reference to these factors, the Sixth Circuit has held that an "object's incriminating nature is not immediately apparent if it 'appears suspicious to an officer but further investigation

---

[12] The Court notes the interplay between the fourth element of the plain view doctrine and the automobile exception. "The right to search the interior of the vehicle under the automobile exception thus provided officers with a lawful right of access to the car sufficient to satisfy the plain-view exception." *See United States v. Galaviz*, 645 F.3d 347, 357 (6th Cir. 2011); *see also Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) ("The final requirement [of the plain-view exception], that the officer have a lawful right of access to the object, is meant to guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances, but does not bar the seizure of evidence in a parked car." (internal citations omitted)). Supported plain view dovetails with the warrant exception to allow entry into a car in order to seize contraband perceived.

is required to establish probable cause as to its association with criminal activity.'" *Garcia*, 496 F.3d at 511 (citations omitted).

Here, Officer Brown believed the baggie in the door to contain marijuana based on a) the location/time of day of the scene; b) the sling bags in the floorboard; c) the open container of alcohol; d) the baggie's properties and Brown's experience; and e) the fact that Bond had a drug felony. The Court, sorting the always fact-intensive proof as a totality, finds that Brown had reason to be suspicious, but that his suspicion did not rise to the higher threshold of probable cause.

First, the parking circumstances. LPD had been focused on the busy downtown Short Mill area all summer, surging officers at night on the weekends in an effort to quell crime and deal with heightened drug and firearm activity. That sets the scene and explains Brown's "proactive," as he called it, plain-view monitoring of parked cars. However, Lexington is a large place, and more people downtown likely means more criminal activity but also more innocent citizens. The Court, consistent with Sixth Circuit and Supreme Court precedent, assigns slight weight to the fact that the car appeared in the general area of higher police and criminal activity. *See United States v. See*, 574 F.3d 309, 314 (6th Cir. 2009) (noting that, even in the context of a *Terry* investigatory stop, "[a]n individual's presence in an area of expected criminal activity [or a "high crime area"], standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime." (quoting *Illinois v. Wardlow*, 120 S. Ct. 673, 676 (2000))).

Second, the sling bags. Brown depicted use of the opaque bags, for illicit purposes, as on the rise or becoming "more common," often concealing drugs or guns. He conceded on cross that such bags are popular and often carried for completely legitimate reasons. Part of his suspicion came from the fact that the bags were tucked under the seats, as if to hide them. He admitted though that secreting valuables, including legal valuables, would be common. Further, the Court

13

independently notes that the passenger-side bag plainly was in the floorboard and not hidden under the seat, eroding that credibility point. The sling bags, a potential vessel for good or ill, offer little in the probable cause calculus. The Court, absent more empirical evidence than this record features, is reluctant to view an item (like a purse or bag) in common, legitimate circulation as indicative of crime just because some criminals use the item nefariously. That purses, satchels, or cars often contain evidence of crime does not mean there is cause to search all purses, satchels, and cars.

Third, the alcohol container. The Court has already rejected the alcohol as an independent entry basis. The Government made no alternative argument as to its relevance in the probable cause determination and did not suggest that the alcohol in the car would make the sling bags or door packet more likely to contain marijuana. As such, the alcohol essentially drops out as a probable cause factor. This was a central catalyst on the night, so its exclusion from the mix is telling.

Fourth, and of focus, is the package corner seen in the passenger door panel. The Court has several observations about that. Brown told his story under oath, but the car description has undergone much narrowing over time. When the ATF sought a criminal complaint against Bond, the Agent averred: "In plain-view, officers observed several pre-packaged baggies of marijuana in both the driver's side door and the front passenger's door." DE 1-1 at ¶ 5. In its brief, the United States again stated that "officers observed . . . prepackaged marijuana baggies in the vehicle doors." DE 21 at 2. The brief also detailed distinctive bag features (like rainbow or holographic effects and text references to marijuana). The hearing proof, where the rubber meets the road in deciding suppression, indicated that only one officer (Brown) saw a solitary *potential* bag only in the passenger door panel. From his vantage point, Brown could not see the entire bag, but rather

14

he observed only the rounded corner of what he perceived as a bag of the type frequently associated with the packaging of marijuana and THC products. So, not multiple bags in both doors seen by multiple officers. Instead, one corner seen by one officer in one door.

Brown testified that he saw enough to recognize the texture of the bag, but he saw no graphics or print on it. He inferred it to be a small, rectangular bag typically used to market THC products or marijuana. The Court accepts that he, as a matter of experience, often sees bags of the type he described holding marijuana contraband. The problem here is that Brown did not see a bag; he saw only a corner. Though he purported to infer the bag's size and shape and features from the one corner seen, defense counsel's cross-examination enervated the foundation. Brown admitted on cross that the same material is used in bags marketing legal, commonplace products, *e.g.*, candy and coffee. He distinguished those uses as involving much larger bags, but then he conceded he could not tell the length of the bag in the door pocket. The Court also views it as unreasonable to conclude the shape of an object by seeing only one small corner of that object.

Brown claimed other uses involved larger and longer bags, but he agreed that he could not tell the length or dimensions of the bag (how it was situated, whether it was folded) from the corner he could see. Though he steadfastly testified that the bag in the door was a marijuana bag (and he ended up being correct), he was not able to distinguish the presentation he saw in the car from the innocuous mylar or shiny metallic bags he agreed routinely carry legitimate products. This strongly indicates that Brown *suspected* contraband but that he would need more information (to see the full bag, to see the bag's labeling, to know the dimensions and to see the complete top edge and be able to see the manner of opening/closure or resealing) to make a probable cause

15

determination.¹³  Again, plain view requires that material be immediately incriminating, and the solitary corner peeking out of the door pocket simply does not rise to that level.

Brown lastly cited the fact that Bond had a cocaine felony. The Sixth Circuit has held that a defendant's criminal history is relevant to, but not dispositive of, a probable cause inquiry. *See United States v. Dyer*, 580 F.3d 386, 392 (6th Cir. 2009). The Circuit has said, "a 'person of reasonable caution' would take into account predilections revealed by past crimes or convictions as part of the inquiry into probable cause." *See United States v. Wagers*, 452 F.3d 534, 541 (6th Cir. 2006). Of course, Brown knew no particulars regarding Bond's conviction. At the hearing, Brown knew only that Bond had a felony involving cocaine (not marijuana) charges. He did not know when or where the conviction occurred and did not know if it was a trafficking or possession matter.¹⁴

The drug conviction is pertinent and contributes logically to the totality. It is somewhat more likely that a person with a felony cocaine conviction would illegally possess a different drug, here marijuana. The lack of temporal information thins the nexus, though, and the Court is careful to recognize that a prior felony does not signify open season for warrantless seizure or arrest. *See United States v. Cupps*, 503 F.2d 277, 281 (6th Cir. 1974) (holding knowledge of prior record relevant but such knowledge "insufficient either to establish probable cause or to afford the basis for reasonable suspicion"); *Beck v. Ohio*, 85 S. Ct. 223, 228 (1964) (warning that to treat knowledge of prior record as establishing probable cause "would be to hold that anyone with a previous criminal record could be arrested at will"). Finally, given that nothing shows that officers

---

¹³ He also conceded that lawful CBD products come in similar packaging.
¹⁴ Though it ends up that Bond actually was on probation, per Judge Stinnett's detention decision, *see* DE 16 at 4, the Government did not argue that status as part of the suppression analysis.

16

on the scene confirmed Bond's identity prior to the search, the linkage between the registered owner and a suspicious item partly seen in the passenger door further weakens.

Despite Officer Brown's reliance on his interdiction history during a summer of enforcement, along with other stops during his 2+ years with the LPD, the Court rejects his probable cause determination. As in *McLevain*,

> [I]t was the officer's experience . . . that led them to believe that the seemingly quotidian objects were actually drug paraphernalia. The connection between these items and illegal activities, however, is not enough to render these items intrinsically incriminating. The connection is not enough to make their intrinsic nature such that their mere appearance gives rise to an association with criminal activity.

310 F.3d at 442.

In some ways, the case falls on a continuum between *Texas v. Brown*, 103 S. Ct. 1535 (1983), and *McLevain* or *Loines*. In *Texas v. Brown*, the officer, during a stop, saw the driver drop a knotted, opaque balloon in the floorboard. He also saw powder and balloons in the open glovebox. This, with his experience, satisfied plain view for seizure of the balloon. *See id.* at 1544 (noting "distinctive character of the balloon itself. . . to the trained eye of the officer"). However, in *McLevain*, officers gave experience-based insight into the association of common items (a twist tie, a cut filter, residue on a spoon, suspicious bottle of liquid), but the association was inadequate to justify a plain view seizure of such items, which were "odd" but not "intrinsically incriminating." *See McLevain*, 310 F.3d at 442. Finally, in *Loines*, during a drug interdiction, an officer looked into a car and claimed to see a "bag of dope" in plain view. The *Loines* court rejected plain view in part because the officer at the very most had seen only a small, partially obstructed plastic bag under other innocuous items. An opinion, even of an experienced officer, that what he saw was a non-specific "bag of dope" failed to meet the threshold. *See Loines*, 56 F.4th at 1110.

17

Here, Brown saw a debatable corner of ambiguous packaging, and the surrounding circumstances do not, reasonably, support the sighted object as intrinsically incriminating. With all due respect for Brown's somewhat limited experience, he offered a modest empirical basis for his views on the sling bags, and his conclusions on the purported marijuana baggie required a significant jump. That is, he did not see a small, rectangular, metallic bag and associate that experientially with marijuana. Rather, he saw a fragment of similar packaging and, from such fragment, extrapolated his claimed search basis. That, in fidelity to the plain view and probable cause dictates, fails the test. It would be like the officer in *Texas v. Brown* seeing but a glimpse of opaque rubber but then concluding that he was actually looking at a full, knotted balloon. The hint of a bag of contraband is not the same as a bag of contraband, and what Officer Brown saw does not represent the kind of distinct characteristic that would reasonably gird his conclusion.

The case is close, in some respects, given Brown's characterizations of the typical marijuana packaging and given Bond's felony drug conviction, and the Court is careful to test for a fair probability, not actuality or certainty. However, though the bar is a low one, the Government fails to surmount it by demonstrating probable cause, on the totality, to believe that the items at issue, particularly the corner of the metallic bag, evinced a substantial chance of or connection to criminal activity.

    c. *Terry* **Frisk**

The Government's argument that a search of Bond's person was a permissible *Terry* frisk, independent of the Court's determination of the constitutionality of the officers' vehicle entry, is misguided. "When an officer makes a *Terry* stop, he may also perform a precautionary search—known as a 'frisk' or 'pat down'—whenever he has 'reasonable suspicion' that the person searched may be armed and dangerous." *United States v. Pacheco*, 841 F.3d 384, 390 (6th Cir. 2016) (citing

18

*Knowles v. Iowa*, 119 S. Ct. 484, 488 (1998)). Here, the Government argues the officers had reasonable suspicion to conduct a precautionary frisk of Bond. However, the cited basis supporting the suspicion of danger comes mostly from the contents found in the vehicle, the resulting search of the other subject incident to his arrest, and Bond's eventual admission to firearm possession. Each piece arose after and resulted from the improper car search. As such, because the entry into the car violated the Fourth Amendment, the evidence seized cannot support a later *Terry*-based theory. The foundation for arrest and the admission were also and likewise tainted.

### IV.  Conclusion

For the stated reasons, the Court **GRANTS** Bond's suppression motion, DE 19. Officers entered Bond's vehicle without probable cause, so all direct and derivative fruits of the subsequent search must be suppressed, from the Government's case-in-chief, under the exclusionary rule and the Fourth Amendment.

This the 23rd day of December, 2025.

Signed By:
*Robert E. Wier*  REW
United States District Judge